UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Balram R. Jerry, | § | CIVIL ACTION NO. 10-1505 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| Fluor Corporation and Fluor Enterprises, Inc. | § | |
| Defendants | § | A JURY IS DEMANDED |

**Plaintiff's Response to Defendant's Motion for Summary Judgment
and Motion for Additional Time Under Rule 56(d)**

## TABLE OF CONTENTS

I. Nature and Stage of the Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A. The Project and Jerry's First Steps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    B. The Big Obstacle Jerry Faced:
        Costly Misconduct by Two White Managers
        Ignored by Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    C. Allegations Against Jerry –
        And the Racial Bias Behind Them.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    D. The Pretext: Jerry's Supposed Policy Violations. . . . . . . . . . . . . . . . . . . . . . . . . . 17
        1. <u>The Hours Jerry Worked were Necessary and Approved.</u>. . . . . . . . . . . . . . . 17
        2. <u>Jerry's Personal Cell Phone was Necessary and Approved.</u> . . . . . . . . . . . . 18
        3. <u>Jerry's Use of the Company Truck was Necessary and Approved.</u>. . . . . . . . 19
        4. <u>Fluor Chose to Do Business with ISS and Fluor Approved it.</u> . . . . . . . . . . . 20
        5. <u>The Whole is No Bigger than the Sum of its Parts.</u> . . . . . . . . . . . . . . . . . . . . 22

IV. Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V. Argument and Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    A. Evidence of Pretext.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        1. <u>Mendacity.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        2. <u>Refusing to Give the Benefit of the Doubt.</u> . . . . . . . . . . . . . . . . . . . . . . . . . 28
        3. <u>Changing Stories.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    B. The Defendant Relies on Outdated Caselaw.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    C. Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    D. Two Defendants Are Properly Sued. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI. Rule 56(d) Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES

## CASES

*Alaniz v. Zamora-Quezada*, 591 F.3d 761 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ameristar Airways, Inc. v. Admin. Review Board.*, ___ F.3d ___, 2011 WL 3505466 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93 (2nd Cir. 2001) . . . . . . . . . . . . . . . . . . 28

*Gee v. Principi,*  289 F.3d 342 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Hitt v. Connell,* 301 F.3d 240 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Loveless v John's Ford, Inc.*, 232 Fed. Appx. 229 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38 (5th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Quartino v. Tiffany & Co.,* 71 F.3d 58 (2nd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . 24, 26

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Shattuck v. Kinetic Concepts,* 49 F.3d 1106 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Staub v. Proctor Hosp.*, 131 S.Ct. 1186 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 25, 30, 31

*Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Vance v. Union Planters Corp.,* 279 F.3d 295 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*West v. Nabors Drilling USA,* 330 F.3d 379 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*White v. Burlington Northern,* 548 U.S. 53 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Balram R. Jerry, | § | CIVIL ACTION NO. 10-1505 |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| Fluor Corporation and Fluor Enterprises, Inc. | § | |
| Defendants | § | A JURY IS DEMANDED |

**Plaintiff's Response to Defendant's Motion for Summary Judgment
and Motion for Additional Time Under Rule 56(d)**

A manager who enjoys hearing racial slurs about the plaintiff, B.R. Jerry, who is of Indian descent, is a poor choice to investigate a claim of alleged misconduct by him.  Even Fluor recognizes this.

Q   Would it concern you if somebody who was involved in the investigation, like Amy [LeBlanc], would it concern you if a person like that did have a bias?

A   Yes.

Q   Why?

A   Because it could change the outcome of the investigation.

(Ex. A, Werner Dep. at 40-41). If an independent rather than biased investigation had occurred, Jerry would still be working for Fluor.

An unbiased investigator would praise Jerry for his herculean efforts on this project and take disciplinary action against the white employees whose incompetence caused Fluor's client more than $1 million in damages.  Unfortunately this investigation was tainted by bias from the beginning and that bias led to a logically insupportable decision to terminate the victim of racism on the job.

Summary judgment should be denied because LeBlanc's bias figured prominently in the decision to dismiss Jerry.

## I. Nature and Stage of the Proceedings[1]

The plaintiff, Balram R. (BR) Jerry is of Indian descent and his skin is dark in color. This case stems from Jerry's dismissal on March 7, 2008, after more than 11 years of excellent service to Fluor Enterprises, Inc., and Fluor Corporation.   The facts show that this dismissal would not have occurred if Jerry were white.

## II. Summary of the Argument

At a trial on the merits, Fluor will have an opportunity to present its case – to explain why white employees who cost its client damages of over $1 million were not held accountable, yet a person of color who tried so hard to get the project on course was singled out for dismissal. It will likewise have the opportunity to explain why management allowed open racial bias to flourish at the job site. It may also provide an explanation for how it chose to approach the allegations of misconduct against Jerry, who was a known target for racially bigoted comments – by allowing an individual who herself was known to have a racial bias to conduct much of the investigation. And, despite the steadfast refusal to interview Jerry, the many witnesses who had observed the racial bigotry, and witnesses who knew that the allegations against Jerry had no basis in fact, Fluor will have an opportunity to argue why its decision to fire this remarkably smart and dedicated worker had nothing to do with his race.  But at this stage of the proceeding, there is no cause for judgment as a matter of law.

_____

[1] The plaintiff agrees with the defendants' statement of the stage of the proceeding.  Dkt. 39 at 2.

2

When the evidence is viewed in the light most favorable to the plaintiff, it shows that Jerry was an employee who went above and beyond the call of duty to work for the success of the project – and whose only failing was that he naively thought that racially-biased employees could not cost him his job. The evidence shows that repeated racial slurs, gross incompetence and even serious safety violations were overlooked when white employees were involved.  But, when individuals with racial bias concocted complaints about Jerry, he was out the door. This is a case where the material facts are hotly disputed and where racial bias directly led to a good employee's termination.  Rather than acknowledging these facts, Fluor relegates LeBlanc to only a footnote reference even though she was a major player in the decision to dismiss Jerry.

The issues of law are also straightforward. One is whether the court is permitted, at this juncture of the case, to construe the disputed facts in a light most favorable to Fluor – to treat Fluor's Statement of Facts as true, to find each of Fluor's witnesses to be credible, and to ignore evidence that contradicts Fluor's version of what happened and why. Another question is whether the facts, construed in a light most favorable to Jerry, would support a jury finding of liability. This particular question presents an opportunity to assess the recent Supreme Court decision in *Staub v. Proctor Hosp.*, 131 S.Ct. 1186 (2011), on the question of causation when there is proof of bias but the titular decision-maker is a different person.

### III. Statement of Facts

BR Jerry is an instrumentation engineer.  His specialty focuses on measuring instruments that are used in the design and configuration of automated systems  – with the goal of improving system productivity, reliability, safety, optimization, and stability.  Instrumentation engineers devise a road map to ensure plants are engineered to run well. (Ex. E, Declaration of B.R. Jerry,

at 3.) According to his peers, BR Jerry is "one of the best instrumentation engineers in the business - hands down." (Ex. J, Declaration of Troy Mallory at para. 16 and 5 ("[He] is an engineer of exceptional competence and care[.]"); Ex. I, Declaration of Ronald Wright at para. 11 ("BR was the go-to guy."); Ex. G, Declaration of David Jones at para. 3.)

Because of his technical expertise, Fluor sent Jerry around the globe trouble-shooting on projects.  In the course of his career with Fluor, he worked not only on multiple projects in the United States, but also in Russia, Saudi Arabia, Kuwait, and Trinidad. (Ex. E, Declaration of B.R. Jerry, at 4.) Jerry's final assignment for Fluor was in Texas City, beginning in the summer of 2006. (Ex. E, Declaration of B.R. Jerry, at 5.) His treatment there proves that old adage, "No good deed goes unpunished."  Even though he worked tirelessly for the project's success, he found himself without a job because a supervisor with a racial bias made a series of "complaints" which she was then allowed to "investigate." (Ex. F, Kindervater Dep. at 28-29; Ex. B, FEI 00330, 332-333, 335-336, 375-376, 387-388, 390, 395.)  Fluor's investigation was so one-sided that neither Jerry nor the many colleagues with whom he worked were interviewed.  (Ex. F, Kindervater Dep. at 29, 55-56, 61.)

No one talked to Jerry before Fluor presented him with a stark choice – resign or be fired. (Ex. F, Kindervater Dep. at 117.)  And, even later, when a number of knowledgeable people from both Fluor and BP complained about Jerry's dismissal, Fluor refused to respond to even one of them. (Ex. F, Kindervater Dep. at 29, 55-56, 61.)  These individuals knew what Fluor has ignored – that the actions of an employee who went above and beyond the call of duty had been wrongly portrayed. They knew that white employees who were seriously deficient in their jobs and who committed serious misconduct were given a free pass.

**A. The Project and Jerry's First Steps**

In Texas City, Jerry worked on rebuilding a British Petroleum (BP) refinery that had been severely damaged in Hurricane Rita.  The refinery's condition had deteriorated even further because it sat idle for nearly a year while BP dealt with insurance coverage issues. (Ex. E, Declaration of B.R. Jerry, at 5.)

When Jerry started this assignment, he sat down with two Fluor employees – Danny King, the project's construction manager, and Chris Henry, its engineering manager.  They handed him the job notes for the project –  a document of more than 60 pages that listed all the instrumentation problems. (Ex. E, Declaration of B.R. Jerry, at 6.)  That document did not, however, contains the specifics of what steps were needed to restore the refinery to functional capacity.  Details about the causes of these problems and how they could be resolved was Jerry's to determine.

After reviewing the job notes, Jerry met with Donald Warnell, BP's reliability instrument engineer, to find out more specifically what BP expected at the end of this project - other than an efficient refinery.  He learned that BP also needed a comprehensive list of all instrumentation as well as its specific manufacturer and capacity so that the plant could be maintained well into the future.  BP needed both a solution to the current problems and a roadmap for the future. And that is precisely what Jerry provided. (Ex. E, Declaration of B.R. Jerry, at 7.)

Jerry went to work.  He walked the multi-acre refinery and, over time, put together the information the job notes lacked.  (Ex. E, Declaration of B.R. Jerry, at 7.) For example, a job note would report that a temperature indicator did not read out on the control console.  Jerry then went out to the field and found out why: the thermocouple or the temperature transmitter on the

5

indicator was either broken or missing.  Jerry could then determine and make note of which part

needed to be replaced and its exact specifications.  This process was repeated about 1,000 times.

As a result of his hard work, Jerry was able to prepare a comprehensive list of all the parts that

had been damaged and assess whether they simply needed to be replaced or whether they could

be rebuilt at a lower cost. (Ex. E, Declaration of B.R. Jerry, at 7.)[2]

**B. The Big Obstacle Jerry Faced:**
**Costly Misconduct by Two White Managers**
**Ignored by Management**

Jerry found himself working long hours to get the job done, but, rather than receiving

cooperation from white managers, he faced open racial hostility.  Two men, construction

managers Joe Yost and Jeff Williams, devoted much of their energies, not to the proper project

management, but to demeaning Jerry.  (Ex. E, Declaration of B.R. Jerry, at 18; Ex. I, Declaration

of Ronald Wright at para. 5; Ex. J, Declaration of Troy Mallory at para. 7.)  Project employee

David Jones describes the behavior of construction manager Williams:

> I could tell that Mr. Williams hated Mr. Jerry simply because of the color of Mr.
> Jerry's skin.  Every time I was in B.R.'s office to make an order or talk about the
> project, I would overheard Williams cursing at him or calling him names like
> "Bin Laden," "Indian," "Indian Mother Fucker."  Williams made it clear that he
> hated Mr. Jerry because , according to Williams, he was "Indian M.F."  Williams
> would use a different, more harsh tone of voice with Mr. Jerry too, different from
> the way he would talk to white co-workers.  It was clear he wasn't joking around
> when he used this language and this tone of voice with Mr. Jerry.

 (Ex. G, Declaration of David Jones at para. 5).  Williams went out of his way to keep Jones and

Jerry from communicating and actively tried to keep the men from performing important work

---

[2] As described below, this task was made much more difficult by the construction team.
(Ex. I, Declaration of Ronald Wright at para. 8.)

on the project. (Ex. G, Declaration of David Jones at 4, 7). Jones reveals that the other

construction manager Joe Yost also engaged in "constant, racist name-calling." *Id.* at para. 6.

Project employee Ronnie Wright confirms that the racial slurs were so open that they

occurred in the presence of Fluor management, yet nothing was done.

> I couldn't believe that Fluor management let it go on like this. I've worked on
> other Fluor projects and this kind of behavior was never tolerated. Danny King
> was the top construction manager and he would attend all these meetings yet do
> nothing to stop Yost and Williams from spouting their racism.

(Ex. I, Declaration of Ronald Wright at para. 5.) Wright confirms that these slurs happened at

every weekly meeting for "months and months and months." *Id.* at 4; *see also* Ex. G,

Declaration of David Jones at para. 8 ("There were so many managers with offices right next to

Jeff Williams' office, it would be hard for someone in management not to hear the racist names

... [he] hurled at Mr. Jerry. But to my knowledge, nothing was ever done about it.")

Fluor admits that these racists were never held accountable for any of their improper

actions – indeed Fluor represents there was never a complaint about their work. (Ex. H, Mack

Dep. at 91-92.) But the evidence contradicts that assertion. Williams' incompetence was so

severe that he put employees in harm's way – and Fluor knew it.  As Jones explains,

> Williams wanted me to take my team onto a work site without the proper safety
> equipment.  Some gas had recently been released through some newly constructed
> pipes in the area.  Because of the potential for leaks, we needed monitoring
> equipment that would let us know if some of this hazardous gas had escaped.
> Exposure to gas like that could drop you to the dirt in about seven seconds, so
> there was no way I was working out there without the monitors.  But Williams
> kept insisting.  He said it would take too long to get the monitors.  I stood firm.

(Ex. G, Declaration of David Jones at para. 11.)  Even though Jones was acting appropriately in

demanding safety equipment – as BP safety personnel concluded – Williams accused Jones and

the team of insubordination. *Id.*  And even though the manager to whom Williams complained

acknowledged that Williams "had issues," he took no action.  *Id.* at para. 12. He merely

volunteered that if Williams made a complaint about Jones insisting on the monitors, Williams

would probably get in trouble. *Id.*  In other words, he was not going to consider disciplinary

action unless Williams continued to push his insubordination complaint. *Id.* at para. 12.  And this

was true even though Williams openly admitted his ignorance when it came to the project.  As

Jones explains, Williams  "told us not to ask him any questions because he wouldn't know the

answers." *Id.* at para. 9.

Fluor never investigated any of the misconduct committed by these two deficient and

biased, but white, employees.  The only "investigation" was of the man who was repeatedly

called on to repair the damage the two white men created.

Because he knew that instrumentation had to be removed from the refinery before the

towers could be rebuilt, Jerry asked these construction managers to remove instrumentation

carefully. (Ex. E, Declaration of B.R. Jerry, at 9).  He even made sure pallets were available to

store the material.  But, instead of honoring his request, the material was either thrown in huge

piles on the ground or put in large stacks on pallets. (Ex. J, Declaration of Troy Mallory at para.

3.)  Either way, the material was damaged – and had to be either replaced or rebuilt.  When Jerry

brought this costly problem to Danny King (with pictures of damaged valves), King told Jerry to

ignore the problem and not mention it again.  Jerry also told Chris Henry about the same

problem, but again no action was taken.  As a result, Jerry had to oversee the rebuilding of 99%

of the valves for the refinery at a cost of more than $750,000.  (Ex. E, Declaration of B.R. Jerry,

at 9.)

Over and over Jerry encountered problems because of the construction managers' incompetence. One day Jerry realized that the two had "lost" 140 satellite coated thermowells needed for the project.  Instead of storing these expensive items (some cost $1,100 a piece),  they threw them all in a dumpster – which was hauled away before Jerry learned of the problem.  So Jerry had to do yet additional work – he had to respecify the materials and then the instruments had to be repurchased.  Again, Jerry raised the issue with Henry.  Again, nothing was done. (Ex. E, Declaration of B.R. Jerry, at 11.)

Another frequently recurring problem was that instruments bought for the project were received but then supposedly "lost" by the construction people before they could be installed. (Ex. I, Declaration of Ronald Wright at para. 6.)  Both Henry and later Werner knew about this problem, and were even called upon to sign purchase orders when products had to be purchased a second time. And, even though this problem cost Fluor's customer, BP, at least $200,000, the white construction managers were never held accountable.  (Ex. E, Declaration of B.R. Jerry, at 12.)

But Fluor's client, BP, suffered the financial consequence.  BP was charged over and over for the incompetence of men who, according to Jones, had no business being in supervisory positions.

> Joe Yost and Jeff Williams seemed to do whatever they wanted on the job site.  It was frustrating to see them in supervisory positions because they didn't have any expertise in construction and to boot, they were lazy and weren't getting their job done.

(Ex. G, Declaration of David Jones at para. 13; *see also* Ex. I, Declaration of Ronald Wright at para. 6 ("[I]f Williams and Yost had gone out into the field to supervise their workers like they were supposed to, they would have figured out that guys on the construction team were losing

9

parts and breaking parts left and right."), para 8 ("[A] lot of very expensive valves got wasted."), and para 13 ("It seemed like [Williams] didn't know what he was doing[.]"))

Williams and Yost worked hard to blame Jerry for the mistakes of their construction teams. (Ex. I, Declaration of Ronald Wright at para 4, 6, 9, and 13.) Meanwhile, Jerry worked hard to repair the damage they caused. (Ex. I, Declaration of Ronald Wright at para. 9-11; Ex. J, Declaration of Troy Mallory at para. 3 ("BR would pick up these now junked parts and take them himself to get repaired or rebuilt by a machinist so that some of them could be salvaged and the client could be spared additional expense.")) His BP contact, Maggie McGhee, complained to him repeatedly that parts that had been working the night before were being destroyed by the construction crew.  McGhee also complained that he raised the issues these managers, but nothing was done.  (Ex. E, Declaration of B.R. Jerry, at 15.)

Jerry acted differently when BP complained – he took action.  One day, McGhee complained that a particular valve positioner was not working.  McGhee got no action from the Fluor construction crew, but, when he turned to Jerry, he got a different response.  Jerry climbed a 250 foot tower and fixed the positioner.  Certainly, that was not a job requirement.  But it shows his commitment to the project and the client. (Ex. E, Declaration of B.R. Jerry, at 16)  In a similar vein, Jerry came back to work only a few days after having a heart attack and surgery. (Ex. E, Declaration of B.R. Jerry, at 17.) The white construction managers, by contrast, simply sat on their hands.

These are but a few examples of the deliberate and open misconduct of white employees on this project.[3]  And they are an appropriate introduction to a discussion about the supposed

---

[3] Yost and Williams were hardly alone in putting the interests of BP last.  While Jerry was in the beginning stages of this long process, Chris Henry told Jerry that twenty Fluor

misconduct of Jerry.  For, as the Supreme Court said in *White v. Burlington Northern,* 548 U.S. 53 (2006) "context matters." 548 U.S. at 69.  It is easy to fault someone for actions when you look at them in a vacuum.  But Fluor's project managers were not looking at the issues in a vacuum.  They took absolutely no action when it came to repeated misconduct by white employees – even misconduct that threatened lives, even misconduct that cost BP over a million dollars.  (Ex. G, Declaration of David Jones, at para.12-13, Ex. I, Declaration of Ronald Wright at para. 5; Ex. J, Declaration of Troy Mallory at para. 4.)[4]  On the other hand, Fluor allowed racial bias to cause the dismissal of an excellent worker – without even allowing him to give his side of the story.  Indeed, Fluor ignored any information that did not fit the story that Amy LeBlanc had presented to them.

---

employees would be arriving at the project and had been assigned to Jerry.  Jerry was stunned and told Henry that he had nothing for these people to do yet.  Henry said he had no idea what they could do, but they were coming. Jerry was not satisfied with Henry's answer.  He knew it was wrong to charge the client for workers who could not contribute, so he came up with a plan. He told Henry that he would bring his own equipment from home so that the employees could use it to do a variety of different tests on instruments.  Henry promised Fluor would pay for this equipment (although it never did) and Jerry brought it in so that these employees could contribute and not simply be dead weight.  (Ex. E, Declaration of B.R. Jerry, at 8; Ex. J, Declaration of Troy Mallory at para. 17.)

[4] Part of Jerry's job was to ensure that he prepared specifications for materials according to BP's schedule.  So, for example, in late 2006, Jerry worked through the Christmas holidays drafting the specifications for a huge number of motors because BP wanted to order them before year's end to take advantage of a tax break. But when he took the specifications to the project buyer, Roger Black, Black told Jerry he would buy them when he felt like buying them.  Then the problem got worse.  When Black belatedly placed the order, he bought one that was not on the list – and it cost at least $100,000.  Jerry was shocked when he saw that this huge expense was charged to BP.  This time he went directly to Henry.  Again, no action was taken.  No one questioned Black, who was white, about wasting $100,000 of BP's money.  Just like no one bothered to question the white construction crew leaders about their constant waste of BP's money. (Ex. E, Declaration of B.R. Jerry, at 10, 14.)

11

### C. Allegations Against Jerry –
### And the Racial Bias Behind Them

A work site that is poisoned by racial bias tends to get worse when management fails to intervene.  And so it was here.  While the racial bias was first exhibited by Williams and Yost, it thereafter spread to other employees.  Luke Maxwell, for example, regularly complained to office manager Amy LeBlanc that Jerry could barely speak English, he ridiculed Jerry's accent, and he talked about how the construction crew did not want to work with Jerry who was, after all, a "damn Indian." (Ex. J, Declaration of Troy Mallory at para. 8-10.)  LeBlanc demonstrated her agreement with Maxwell's comments, and even nodded her head and laughed when he made racist comments.  This kind of exchange was not a one-time event, it occurred on a daily basis, often numerous times per day. *Id*. And, ultimately, LeBlanc found a way to turn her attitudes about Jerry into action that got him dismissed.[5]

While Fluor Enterprises initially represented that no complaint had been made about Jerry, (Ex. H, Mack Dep. at 84-85), subsequent depositions have revealed otherwise.  LeBlanc complained that Jerry was using a company truck too frequently and leaving his car at the plant. (Ex. A, Werner Dep. at 19-20.)  This complaint originated with Williams.  (Ex. I, Declaration of Ronald Wright at para. 12 ("[N]obody had a problem with [BR using the truck] until Jeff Williams started complaining."))  And witnesses cannot name a single person who complained

---

[5] LeBlanc's racism towards Jerry was obvious to his wife Valerie Jerry. Valerie is white, making her and her husband an interracial couple. The first time LeBlanc met Valerie and saw her together with BR, Valerie could tell that LeBlanc was troubled to be in the presence of an interracial couple. She could see it in LeBlanc's eyes and in LeBLanc's tone of voice. Valerie Jerry knows the look and sound of a racist person because sadly, she has experienced it before. (Ex. P, Declaration of Valerie Jerry at para. 5.)

about Jerry besides LeBlanc. (Ex. A, Werner Dep. at 19-20; Ex. K, Daniel Dep. at 79-80; Ex. F, Kindervater Dep. at 24-25, 27.)

Indeed, LeBlanc was involved in the so-called independent investigation from the word go.  The email that allegedly started that investigation — from Senior Director of Operations Mal Werner to Fred Kindervater (the man who ultimately fired Jerry)– was preceded by an email from LeBlanc, in which she wrongly states that Jerry convinced procurement staff to buy from his wife's company ISS when he had been told that this was not permitted.  (Ex.  K, Daniel Dep. at 29-30.) LeBlanc is dead wrong on both counts, but Werner took her bait.

LeBlanc's false claims then figured directly into Kindervater's findings.  First, as he admitted in his deposition, he accepted Leblanc's story that Jerry had hidden his wife's involvement from Fluor's buyers.

> Q   And do you know, do you have any information that anyone who bought from ISS was in the dark about the relationship between Valerie Jerry and Mr. Jerry and that Valerie owned ISS?
>
> A   Ultimately, yes.  Jim Gray was unaware of it.  And that's when it appeared that B.R., once again directed purchases to ISS.  Because Mr. Gray was not aware of it.

Ex. D, Kindervater Dep. at 57.

If Kindervater had spoken with procurement manager Jim Gray, however, he would have learned Gray had long known that Valerie Jerry owned ISS.  (Ex. E, B.R. Jerry Declaration at para. 25.) But, rather than act independently, Kindervater bought whatever LeBlanc said.  Even months after Jerry's termination, Kindervater still described Jerry as "an employee who had not disclosed a relationship to a project supplier."[6]  (Ex. B, FEI 435).

_____

[6] While Fluor now claims that Werner viewed the relationship between ISS and Jerry as a conflict of interest and one particular purchase as improper, the contemporaneous documents

While Fluor claims the investigation that led to Jerry's departure was independent, the documents show otherwise.  They show no one but LeBlanc gathering information and funneling it to her superiors in an effort to get Jerry removed from the project.  They show that she requested reports, discussed issues with co-workers, gathered data, and asked supervisors to weigh in on Jerry's alleged misconduct. (Ex. A, Werner Dep. at 19-22, 40-41; Ex. K, Daniel Dep. at 32, 34, 69, 79-80; Ex. F, Kindervater Dep.  at 29, 31-32, 35, 40, 47-48, 78-79, 92, 105; Ex. H, Mack Dep. at 12, 30, 37, 39.)   While Kindervater and Roger Daniel, his assistant, are now testifying that they took notes, including hand written notes, and gathered other documentary information that they turned over Fluor HR at the end of their so-called investigation, there is no evidence of such. (Ex. D, Kindervater dep. at 103; Ex. K, Daniel Dep. at 19-20.)   If it ever existed, it has disappeared.

LeBlanc's ability to impact Jerry's future was so great because there were so few other people at the job site in December 2007, when her first complaint was made. (Ex. I, Declaration of Ronald Wright at para. 15.)  The project manager at the time, Mal Werner, was not on site, he was in Sugarland.  And Chris Henry and Danny King had been removed from the project. (Ex. A, Werner Dep. at 6; Ex. K, Daniel Dep. at 39-40; Ex. E, Declaration of B.R. Jerry at 20; Ex. O, Jerry Dep.at 61-62.)  Apart from Jerry, Luke Maxwell and Jim Gray, there were few management level people on the job site.  One of those was LeBlanc – who agreed with and laughed at racial slurs, whose husband regulary socialized with the white men who openly called Jerry "bin Laden," "sand nigger," and "Mother Fucking Indian," and who had a unique

---

show otherwise.  They show that Werner admitted in an audit conducted in 2007 that Jerry had fully disclosed his relationship to ISS with regard to that precise product.  (Ex. B, FEI 449). Never did Werner say anything to Jerry about a concern regarding ISS selling to Fluor.  ISS was, after all, an approved vendor and the relationship was an open book.

opportunity to misuse her position to secure Jerry's dismissal.  (Ex. G, Declaration of David

Jones at para. 5; Ex. I, Declaration of Ronald Wright at para.  4;  Ex.  J, Declaration of Troy

Mallory at para.  15.)

LeBlanc started trouble for Jerry from the beginning.  In 2007, LeBlanc opened the inter-

office envelope that documented Jerry's salary and raise before she gave it to him.  (Ex. E,

Declaration of B.R. Jerry at 21.)  Shortly thereafter, the white construction managers began

angrily complaining that Jerry made too much money.  (Ex. J, Declaration of Troy Mallory at

para.  15 (Mallory heard construction workers say, "That damn Indian is making money and

we're not.")) The racial slurs became more frequent. (Ex. E, Declaration of B.R. Jerry, at 21;

Ex. G, Declaration of David Jones at para. 6.)  And, as Yost finally confessed, he called the

ethics hotline to file an anonymous complaint against Jerry. (Ex. E, Declaration of B.R. Jerry, at

19.)

LeBlanc was permitted this major role even though at the very time she was

"investigating" Jerry, she was the subject of both a formal complaint and an EEOC charge of

racism from an Hispanic employee, Josefina Burr. (Ex. C, Charge of Josefina Burr.) Burr

complained that LeBlanc treated her differently from white employees.  For example, LeBlanc

rudely told her in a meeting that "anyone off the street" could do her job and that she was

making too much money.  *Id.* But LeBlanc made no such rude comments to the two white men

who were paid even more for doing the same job.  And, while LeBlanc refused to give Burr the

tools needed to do her job, she did not have the same response to white employees.  They were

immediately given computers, but LeBlanc refused to give one to Burr even after another

supervisor asked her to do so repeatedly. *Id.* Nor was Burr given the training LeBlanc gave white

15

employees.  And then Burr's pay was cut – but not the white employees who were in her job

classification.

As Burr pointed out

I am Hispanic woman and could not get a computer but two men received computers and training to do their job.  Also Amy said that this was clerical work and when you do clerical work you pay is cut.  If this is clerical work why did an did these men not take a pay cut?  Why are these men doing clerical work?  I did not receive the opportunity like I was promised. I feel like this is descrimination [sic].

(Ex. C, Complaint of Josefina Burr.)

Jerry belatedly saw the same bias himself.  While he is not one to jump easily to the

conclusion that any colleague has a racial bias, he reluctantly realized that LeBlanc harbored

such attitudes.  Near the end of the project, she became incredibly irate with Jerry – but not a

white BP contractor – when the two men did not want to move their offices as she requested.

(Ex. E, Declaration of B.R. Jerry, at 22.) Their reason for not wanting to move was legitimate –

they were incredibly busy.  But, LeBlanc reacted with amazing negativity to Jerry's refusal and

even complained to her boss.  While that man, Mal Werner, did not order Jerry to move, he did

tell Jerry to apologize to LeBlanc. *Id*. When, as a matter of courtesy, Jerry did so, LeBlanc's

body langauge was eye-opening.  She reacted so stridently that he realized her reaction came

from a source he had encountered elsewhere on the project.  In her tone of voice and body

language, her disdain was palpable.  She coldly told him that she would never forget what he had

done. *Id.* He had seen LeBlanc interact with white employees frequently and, each time, she

gave them the benefit of the doubt.  Even when white employees violated her instructions, she

had no adverse reaction and she accepted their apologies with grace.  But, for a person of color,

16

her reaction was poisonous. *Id.* And she certainly did not forget – as her complaints and so-called investigation show.

### D. The Pretext: Jerry's Supposed Policy Violations

After LeBlanc's "investigation," Jerry lost his job in March 2008.[7] Fluor says Jerry engaged in four policy violations, but never allowed him to give his side of the story.

1. <u>The Hours Jerry Worked were Necessary and Approved:</u> One accusation is that Jerry worked too many hours.  Kindervater admitted that LeBlanc gathered the information about this supposed policy violation. (Ex. F, Kindervater Dep.  at 28-29.) Had Fluor been interested in the truth, it would have learned that a lot of Jerry's time was required because of the problems created by Williams and Yost, the incompetent, white construction managers.  Fluor also would have learned that most of Jerry's hours during the commissioning phase (hours that were performed off-site at vendors), were not charged to Fluor, even though it was necessary to the success of the project. (Ex. E, Declaration of B.R. Jerry, at 29.) And if it wanted to, Fluor could have learned that Jerry presented his time sheet every two weeks for approval – and his manager approved them. *Id.*

The pretextual nature of this excuse is made even more obvious when put into context: BP was losing $1 million dollars a day every day it could not restart its refinery operations.  (Ex. E, Declaration of B.R. Jerry, at 19). There was an incredible urgency to get things done quickly. As Maggie McGhee, who worked with Jerry as a BP contractor, explains, "BR put in long hours on this project to support us at our request." (Ex.  M, BRJ000117.) BP's on-site instrumentation and electrical consultant, Don Warnell, explained how BP's needs led to Jerry's work:

---

[7] LeBlanc was so involved in the termination that she knew it was happening before Jerry himself found out. (Ex. E, Declaration of B.R. Jerry, at 23).

On Sunday 03/02 BR was scheduled to be off but an instrument problems came up; we discovery that several flushing rings were needed to correct the vent/drain problem on some of the level instruments.

I called BR at home and asked him to start calling around to see if he could contact any vendors. I needed to have him determine which parts were available in their inventory and if they could supply what we needed by Monday.

(Ex. B, FEI 383). This was a $300 million dollar project for Fluor and it should praise, rather than criticize, Jerry for his diligence and dedication. Instead, it relied on racial bias to dismiss him.

2. <u>Jerry's Personal Cell Phone was Necessary and Approved</u>: Another complaint is that Jerry improperly submitted bills for a personal cell phone. This was Jerry's personal cell phone, which he used on the construction job because Fluor did not provide him with a company-owned cell phone. (Ex. E, Declaration of B.R. Jerry, at 28.)[8] This was a necessary expense and Jerry properly sought reimbursement. Ironically, the project manager approved these bills – month after month. (Ex. D, Kindervater Dep. at 80; Ex. K, Daniel Dep. at 75.; i.e. Ex. B, FEI 324, 326, 339.)

Fluor never bothered gathering the actual facts about Jerry's phone use. If it had, it would have learned that Jerry was using his phone for business purposes. And he did so with explicit permission from his supervisor Chris Henry. (Ex. E, Declaration of B.R. Jerry, at 29; Ex. O, Jerry Dep. at 137-140.) Troy Mallory was present when Henry told Jerry that, "it was okay to use his personal phone for work and assured BR he would be reimbursed for it." Mr. Mallory, who is white, was reimbursed for his cell phone use. (Ex. J, Declaration of Troy Mallory at para. 13.)

---

[8] Fluor gave a company phone to Ronnie Wright, a white man, so he was able to stop using his personal phone. (Ex. I, Declaration of Ronald Wright at para. 14.)

As with the other complaints, LeBlanc provided inaccurate information on this issue. She gave Kindervater an email that supposedly showed that Jerry was not among those authorized to be reimbursed for a cell phone. (Ex. D, Kindervater Dep. at 92) But the email was untrue, as Mallory explains. (Ex. J, Declaration of Troy Mallory at para. 13.) Again, reliance on LeBlanc was the cause of an erroneous finding.

3. Jerry's Use of the Company Truck was Necessary and Approved: Yet another false complaint was that Jerry violated policy by taking a company truck home, which caused the mileage to go up. Fluor admits this complaint originated with LeBlanc. (Ex. K, Daniel Dep. at 29-30.) But, as BP representative McGhee explains, there was no violation. "He used the company truck to pick up and drop off parts at different shops per our request also. Many of these times were past his normal working hours in order to expedite repairs and get next day returns on equipment." (Ex. M, BRJ000117.) Jerry did so with the full awareness and explicit approval of his supervisor Chris Henry. (Ex. J, Declaration of Troy Mallory at para. 14.)

While Fluor claims this was a 'clear cut' policy violation, that is incorrect. Fluor's stated policy prohibits someone from using a company vehicle for non-business purposes. (Ex. B, FEI 237). But Jerry was using the vehicle for "company business." (Ex. I, Declaration of Ronald Wright at para. 12 ("BR wasn't taking the truck home for fun. He as doing it to help the project.")) He used it drive to vendors after hours to ensure that they did their work accurately and met the necessary technical specifications for equipment. (Ex. E, Declaration of B.R. Jerry, at 24, 29-30).

Fluor, however, seizes on a technicality, which is that vehicles are to be returned upon completion of company business and not taken home. Thankfully, neither this Court nor a jury

is required to leave common sense at home. As Donald Warnell of BP explained, using this

excuse to fire Jerry was punishing him for his diligence:

> It is just not right that he should get asked to resign because he drove a truck
> home or worked to many hours after we were beating on him to get parts
> delivered and to support us whenever we needed.

(Ex. B, FEI 383).  Jerry was simply going home *after* completing company business late at night.

Considering his hourly rate, it would have been cost prohibitive if he had returned the truck to

Texas City each evening.

    4.  <u>Fluor Chose to Do Business with ISS and Fluor Approved it:</u> Finally, Fluor accuses

Jerry of a conflict of interest because his wife's company (ISS) provided some equipment for the

project.  While Fluor now claims that this vendor was "a family company," the testimony has

clearly shown otherwise.  This company was a sole proprietorship owned by Valerie Jerry. (Ex.

N, ISS00001; Ex. L, V. Jerry Dep. at 17-18.)  Jerry was not involved in the business in any way

when he worked for Fluor. (Ex. P, Declaration of Valerie Jerry at para. 2.)  Fluor approached *her*

to become a vendor, after which ISS satisfied Fluor's vetting process to become an "approved"

vendor. (Ex. L, V. Jerry Dep. at 31-32, 45; Ex.  N, ISS00009-18.) When Jerry learned that Fluor

was doing business with ISS, he made sure to advise his superiors that his wife owned ISS.  (Ex.

E, Declaration of B.R. Jerry, at 25.) Many different Fluor employee solicited business from ISS,

including Luke Maxwell. (Ex. P, Declaration of Valerie Jerry at para. 4.) Each purchase from

ISS was approved by the procurement department. (Ex. N, ISS000111, 124, 401, 415, 416).[9] Yet

for this imaginary policy violation, only Jerry was punished.

---

    [9] Fluor asked ISS to expedite several of these purchases and approved the additional fees
that went along with expedited orders. (Ex. P, Declaration of Valerie Jerry at para. 4.)

Again, LeBlanc's hands are all over this part of the investigation.  She raised the specter that Fluor was prohibited from purchasing from ISS. And Kindervater relied on it in concluding that Jerry needed to be dismissed. (Ex.  K, Daniel Dep.  at 29-30.) Once again, LeBlanc's information was dead wrong.  As Mallory explains,

> I was there when Mr. Jerry openly disclosed to the Project Manager, Chris Henry, the fact that he wanted Mr. Henry to know up-front that his wife had a company that was a potential vendor for the project.  Mr. Henry's reaction was that if it benefitted Fluor, he had no problem with it.  I happen to have an independent business myself, when I suggested to Mr. Henry that we use that business to provide personnel for Fluor, he approved it, knowing my connection to the business.

Ex. J, Declaration of Troy Mallory at para. 12.

Similarly, Henry hired his nephew on the project, and approved the hiring of Luke Maxwell's wife, Dorinda, LeBlanc's husband, Larry, and countless others.  (Ex. D, Kindervater Dep.at 130; Ex.  H, Mack Dep. at 124.) Danny King hired his own son, Brad King, to work there as well. ( Ex. F, Kindervater Dep. at Ex. 1.) Jeff Williams was proud to brag about his family connections inside Fluor. (Ex. I, Declaration of Ronald Wright at para. 13.) There was no punishment of white employees whose family members benefitted from this project. But Fluor claims it was legitimate to punish the non-white employee.

Fluor also claims that this was the second time this conflict of interest surfaced, but that is not true.  Valerie Jerry had been doing business in Trinidad for years – long before Fluor did any business there.  (Ex. P, Declaration of Valerie Jerry at para. 3.) One day in 2006, unbeknownst to Jerry, a Fluor employee asked ISS to bid on some parts for a project in Trinidad. (Ex. L , V. Jerry Dep. at 31-32.) A few months later, Jerry was verbally reprimanded because he had never revealed his wife's company through the conflict of interest process.  But as he

21

testified, he had no idea she was doing business with Fluor.  (Ex. O, Jerry Dep. at 92-94.) Still, he took this reprimand seriously and he immediately filed the necessary disclosure to advise Fluor of his wife's company.  (Ex. E, Declaration of B.R. Jerry, at 25.) And, as Mallory reveals, he went even further.  He told Chris Henry, the project manager.  (Ex. J, Declaration of Troy Mallory at para. 12.) He also told Danny King and the buyers for the project – Roger Black, Jim Gray, and Jack Mandersheid.  (Ex. E, Declaration of B.R. Jerry, at 25.)

When Gray learned of the relationship, he made a very common sense proposal.  Jerry needed to interface with all vendors about technical issues, but the actual purchase order should always been signed by procurement personnel. And that is precisely what happened. Each ISS sale to Fluor went through Fluor's purchasing approval process and was approved for payment. Jerry had nothing to do with that approval process. (Ex. E, Declaration of B.R. Jerry, at 24-25; *see also* Ex. I, Declaration of Ronald Wright at para. 13 ("BR isn't responsible for problems in the purchasing process. That's why Fluor has a purchasing department."))

5. <u>The Whole is No Bigger than the Sum of its Parts:</u> Each of these four complaints share a certain common thread.  They are all criticisms Jerry could have avoided if he had not worked so hard.  If he had left when the proverbial whistle blew at closing time, no one at Fluor could have complained about his hours and he would have taken his own car home (which was much nicer than the company truck).  If he had not bothered to answer his cell phone when the client was calling him at all hours of the day, Fluor and BP would not have been able to find him when they needed him.

Even the so-called conflict of interest claim boils down to him working too hard to ensure that BP got the products it needed very quickly.  There is no doubt that BP was pressuring

Jerry and Gray to get material quickly. Donald Warnell admits that he and BP were "beating on [Jerry] to get parts delivered and to support us whenever we needed." (Ex. B, FEI 383). At the project's weekly status meetings, Yost and Williams were demanding swift delivery of material so often that "the demands became very abusive both Mr. Gray and Mr. Jerry." (Ex. M, BRJ000119). The complaints and pressures were so overwhelming that some of the engineering team refused to attend these meetings. (Ex. I, Declaration of Ronald Wright at para. 5.)

In this environment, the procurement people would regularly ask Jerry where they could buy items.  People even called him on the weekend to get products quickly.  Through his vast experience, he knew various sources for those products.  He knew that certain products were available from Cobia Controls, he knew others could be obtained from Sandelius Instruments or Houston Armature. (Ex. E, Declaration of B.R. Jerry, at 26.) Each of those vendors made hundreds of thousands of dollars on the project.  And for a few of the smaller purchases, he knew that ISS could provide them.  He did not tell the purchasing department to order from his wife. *Id.* The procurement people purchased as they saw fit.

In looking at Jerry's termination, it is also important to consider that this job site was hardly a place where any perceived infraction was dealt with harshly.  Jeff Williams and Joe Yost were never even investigated, much less disciplined, for their multiple acts of misconduct, including allowing destruction of BP property, incompetence in doing their assigned tasks, and blatant racism.  (Ex. I, Declaration of Ronald Wright at para. 5 ("I couldn't believe that Fluor management let it go on like this.")) Nor was Williams investigated or disciplined for ordering multiple employees to forego safety equipment in a situation that could have caused their deaths. (Ex. G, Declaration of David Jones at para. 10-12; Ex. J, Declaration of Troy Mallory at para. 5.

("At one point, Malcolm Werner asked me directly why there were so many problems on the project. I told him it was because of a lack of supervision and that it started from the top down. He said he would look into that.  But nothing ever changed."))

Even Fluor acknowledges that one white employee – Danny King -- was repeatedly violating company policy after being warned not to do so. Still, no real action was taken.  King repeatedly took co-workers and clients to a strip club and used his company credit card to pay for it. After Fluor gave King a full opportunity to explain himself, it gave him only the proverbial slap on the wrist. (Ex. A, Werner Dep. at 46-49.) Indeed, Fluor's reaction when a white employee repeatedly used its resources for non-business purposes was to make excuses. Werner said it was common for Fluor employees to go to topless bars after hours. After all, he said, if you work hard, you play hard.  *Id.*  And even when King kept repeating the same violation, Werner took no action. He just kept writing him up. (Ex.  H, Mack Dep. at 75.)

### IV. Summary Judgment Standard

Summary judgment standards require that all the evidence be viewed in the light most favorable to the non-movant, BR Jerry.  Moreover, the Supreme Court has counseled that, in reviewing a summary judgment motion, "[T]he court . . . must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151 (2000).  Instead of honoring this rule, the defendants simply ignore most of the relevant facts and spin the rest in the light most favorable to them.

Neither do summary judgment standards allow the defendants to obtain judgment as a matter of law when they ignore the law.  But Fluor asks this of the Court, citing law that has

24

been mooted by the U.S. Supreme Court's decision in *Staub v. Proctor Hosp.*, 131 S.Ct. 1186 (2011).

Finally, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on a motion for summary judgment. *Id.* at 255. These standards require a jury trial.

### V. Argument and Authorities

While this is a case with abundant direct evidence of discrimination, Jerry can also prove he lost his job because of discrimination under the test required for a circumstantial evidence case. To do so, he must show that he (1) was a member of the protected class; (2) was qualified for the position; (3) was fired; and (4) was either replaced by someone of another race, was treated less favorably than employees who were similarly situated, or was otherwise discharged because of his race. *See West v. Nabors Drilling USA,* 330 F.3d 379, 384 (5th Cir. 2003). Even Fluor assumes that Jerry satisfies the elements of the prima facie case. For, as the Fifth Circuit has made clear, the burden for establishing a *prima facie* case is "very minimal." *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996).

Indeed, Jerry is certainly able to prove the elements. He is dark-skinned and of Indian descent, he was a fine employee, he was dismissed, and there is both direct and circumstantial evidence that his discharge was not abased on the facts, but instead resulted from racial bias. The burden of production then shifts to the defendants to articulate a legitimate, non-discriminatory reason. And finally, Jerry has the burden of proving pretext. Pretext can be shown in many

ways, but *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000). makes the math simple: prima facie case + sufficient pretext evidence to reject the employer's explanation = liability. 530 at 149.

### A. Evidence of Pretext

1. <u>Mendacity</u>. Proof that the defendant is lying is a standard way to prove pretext. And this case has mendacity in spades.  For years, Fluor claimed that there was no termination. It made this representation to the EEOC and, later, under oath at the corporation's deposition. (Ex. B, BRJ000086; Ex. H, Mack Dep. at 19.)  Here are just a few opportunities for a jury to find mendacity:

| | |
|---|---|
| Fluor represented that Jerry was not dismissed.  (Ex. H, Mack Dep. at 19) | Kindervater admits he gave Jerry the choice of resigning or being fired.  (Ex. D, Kindervater Dep. at 114) |
| Fluor represented that there was no complaint made about Jerry. It says an unrelated audit triggered the investigation. (Ex. H, Mack Dep. at 84, 80) | Werner admits that Amy LeBlanc made the first complaint against Jerry. Neither he nor anyone else can name anyone else who complained. (Ex. A, Werner Dep.at 19-20; Ex. K, Daniel Dep. at 79-80; Ex. F, Kindervater Dep. at 24-25, 27) |
| Fluor claims Kindervater and Daniel performed an independent investigation. They say they took notes, including hand-written notes and turned them over to HR. (Ex.  D, Kindervater dep. at 103; Ex.  K, Daniel Dep.  at 19-20) | There are no contemporaneous documents to support that assertion. The only notes from the investigation are LeBlanc's notes.  (Ex. B, FEI 00330, 332-333, 335-336, 375-376, 387-388, 390, 395) |
| Kindervater claims Jerry never disclosed to the procurement manager that his wife owned ISS. (Ex.  D, Kindervater dep. at 96) | Jerry disclosed the fact to procurement. (Ex. E, Declaration of B.R. Jerry, at 25) Roger Daniels admits that Gray knew. (Ex.  K, Daniel Dep.  at 22-23) |

| | |
|---|---|
| Werner claims the "investigation" was carried out according to Fluor policy. (Ex. A, Werner Dep.at 38-39) | Fluor admits it has no policy about investigations. (Ex. H, Mack Dep. at 16) |
| Werner claims that he told Jerry and the purchasing department not to use ISS unless it was part of a competitive bid process.(Ex. A, Werner Dep.at 15-16) | Werner made no such directive. (Ex. E, Declaration of B.R. Jerry, at 27) Regardless, Fluor admits that it does not even know whether ISS made sales that were not competitively bid.(Ex. H, Mack Dep. at 50-51) |
| Fluor claims there was no racial bias in the workplace. (Ex. H, Mack Dep. at 120; Ex. A, Werner Dep.at 42; Ex. K, Daniel Dep.at 57) | The record includes open racial slurs by Williams and Yost. (Ex. I, Declaration of Ronald Wright at para. 5; Ex. J, Declaration of Troy Mallory at para. 7; Ex. G, Declaration of David Jones at para. 5)  It also documents LeBlanc nodding in agreement with and laughing at racial slurs. (Ex. J, Declaration of Troy Mallory at para.8) Further, LeBlanc was the subject of an EEOC charge for race discrimination (Ex. C, Charge of Josefina Burr) |

Where, as here, Fluor has misrepresented what happened to Jerry, why it happened, and who was involved, a fact-finder's assessment is required.  The Fifth Circuit has made this abundantly clear:

> If the trier of fact does not believe the employer to have given a truthful account of its decision, it is reasonable to infer that the most likely explanation is the one the employer cannot admit—that it acted for retaliatory or discriminatory reasons.

*Ameristar Airways, Inc. v. Admin. Review Board.,* ___ F.3d ___, 2011 WL 3505466 (5th Cir. 2011).

Fluor's selective retention of documents – discarding any that undermined its story – is another strong sign of mendacity. *See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 111 (2nd Cir. 2001) (at summary judgment enough circumstantial evidence exists to permit a

reasonable trier of fact to conclude that the destroyed documents would show unlawful discrimination.)

   2. Refusing to Give the Benefit of the Doubt. Fluor never gave Jerry, a well-respected employee with a good record, the benefit of the doubt. This could be sufficient reason for a jury to conclude that the result was pre-ordained, and that it was because of racial bias. *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1159-1160 (10th Cir. 2008) (summary judgment reversed because, rather than giving the plaintiffs the benefit of the doubt, the company relied on only negative evidence and failed to interview key witnesses).

   Here, Amy LeBlanc made the first complaint, investigated the complaints, and provided the evidence considered when Fluor made the final decision about Jerry.  (Ex A, Werner Dep. at 19-22; Ex.K, Daniel Dep. at 29-30 32, 34, 69, 79-80; Ex. F, Kindervater Dep. at 29, 31-32, 35, 40, 47-48, 78-79, 92, 105; Ex.  H, Mack Dep. at 12, 30, 37, 39.)  But while Fluor management was willing to credit a person with a racial bias, it was not willing to listen to Jerry.  He was not interviewed about Fluor's concerns. (Ex. F, Kindervater Dep at 9; Ex. K, Daniels Dep at 35; Ex. O, Jerry Dep at 52-53; Ex. E, Declaration of B.R. Jerry, at 31).  Even more disturbing is the fact that many people who worked with Jerry were not interviewed  – even when they expressed disagreement with and concerns about his dismissal.  (Ex. F, Kindervater Dep at 61-62.) Just as in *Trujillo,* Fluor credited only negative evidence.  For example, Jim Gray twice tried to engage Fluor management about the dismissal. No one responded to him. (Ex. F, Kindervater Dep at 55-56.)  He would have had clear evidence that LeBlanc was lying or, at best, dead wrong.  Gray knew about Jerry's wife's company.

3. <u>Changing Stories.</u>  Inconsistent, shifting reasons offered by an employer also constitute sufficient evidence of pretext to support a finding of liability. *See, e.g., Gee v. Principi*,  289 F.3d 342, 347-48 (5th Cir. 2002)*; Loveless v John's Ford, Inc.*, 232 Fed. Appx. 229 at *235 (4th Cir. 2007) (affirming jury verdict where the proffered explanation at trial – poor performance – contradicts reason given to the plaintiff at the termination meeting – desire for younger, more aggressive managers). The record provides unquestionable evidence that Fluor, and its witnesses, have changed their stories several times.

Over time, the four "reasons" initially offered for Jerry's dismissal have changed dramatically.  Now, the purported problem with his wife's company is that he had hidden her involvement.  (Ex. F, Kindervater Dep at 53-54.) Now the purported problem with his company phone is that it was a "family" phone.(Ex. F, Kindervater Dep at 81-82.)  Now the purported problem with his use of the truck is he was doing errands for his wife's company. (Ex. F, Kindervater Dep at 34, 39.)  Over time, these excuses have changed and now they focus on Jerry's wife.  But those were not the excuses at the time.  When a party changes its story so fundamentally over time, it presents a credibility issue only a jury can decide.  Why, after all, would it need to transform its excuses if the original excuses were valid?

This is a case that needs to be tried.  It is not a case where legitimate performance issues led to a man's dismissal, it is one where the plaintiff's race was the cause for concern.

**B. The Defendant Relies on Outdated Caselaw**

Fluor also cannot properly seek judgment as a matter of law when it mis-cites the law.  In Fluor's statement of the issues that allegedly support summary judgment, (Dkt. 39 at 2), the operative issue – whether a person with racial bias impacted the decision to dismiss Jerry – is not

addressed.  Fluor relies on cases that focus on the good faith of the titular decision-maker, when the U.S. Supreme Court has now announced a very different rule.  As Justice Scalia wrote in *Staub*, a focus on only the titular decision-maker would effectively shield employers "from discriminatory acts and recommendations of supervisors that were *designed and intended* to produce the adverse action."  131 S.Ct. at 1193 (emphasis in original).

In *Staub*, both the plaintiff's immediate and second level supervisors had a bias against his military service.  And that bias led Staub's immediate supervisor to report to Human Resources that he had violated the terms of a corrective action plan.  The Human Resources official reviewed Staub's file and decided to fire him.  No one contended that this official had any bias against Staub's military service.  Nor was there any proof – which Fluor wrongly states is necessary – that the official did not believe in good faith that the termination was justified.  Nevertheless, the Supreme Court still found that the actions of the biased supervisor created liability for the employer – because they infected the result.  As the Court put it,

> the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

131 S.Ct. at 1193.   The Court found the necessary "causal factor" in the fact that the notice of termination expressly stated that Staub was terminated because he had "ignored" the directive in the corrective action – an accusation that had originated with the first line supervisor. Similar to the biased supervisors in *Staub*, Fluor employed no fewer than four people with a bias against Jerry because of his skin color and what they believed to be his national origin.  Ultimately, that racial bias resulted in Jerry's termination.

30

Jeff Williams started the ball rolling by complaining bitterly about Jerry's use of a company truck.  (Ex. I, Declaration of Ronald Wright at para.12.) Then LeBlanc made a formal complaint and started "investigating" this issue.  And Kindervater relied on LeBlanc's information in concluding that Jerry's use of the vehicle was improper. (Ex. D, Kindervater Dep. at 37-38.)  Had Kindervater looked, he would have discovered that the information she provided was without merit.  Jerry used the truck to go to vendors after-hours to ensure that materials needed quickly were done to correct specification at the specific request of the customer. (Ex. E, Declaration of B.R. Jerry, at 24, 29-30).

And when it came to the supposed conflict of interest charge, LeBlanc clearly had input as well.  She made the following representation about that issue:

> they [procurement] were no longer suppose to order through this company starting in late 2006.  After Roger Black left the project they started ordering again through BR's wife company.

(Ex. B, FEI 387).  And that mirrors precisely what Kindervater ultimately concluded – that the only reason ISS was allowed to sell products on this job site was that Jerry hid from procurement that this company was owned by his wife.  (Ex. D, Kindervater Dep. at 57).  Once again, LeBlanc's claim made its way into Kindervater's conclusions.  And, once again, that information was demonstrably false.  Fluor employee Roger Daniel admits that Jim Gray did know that Jerry's wife owned ISS.  But curiously no statement was taken from Mr. Gray. And no one ever told Jerry that there was a problem with his wife doing business with Fluor. (Ex. E, Declaration of B.R. Jerry, at 25 and 27).  Henry told him the exact opposite, as Mallory explains.

LeBlanc is *the name* that stands out in Kindervater's mind when it comes to the investigative process. *See, e.g.*, Ex. D, Kindervater Dep. at 26-29, 35, 37-38, 47-48, 77. Yet

Fluor does not reveal her role in Jerry's dismissal in seeking summary judgment. This is one of the many ways in which Fluor seeks judgment under the wrong standard – by portraying the facts in a light most favorable to itself, the movant.  That omission is another sure sign that this case cannot be properly dismissed.

### C. Retaliation

Just as Jerry's discrimination claim should be set for trial, so too should Jerry's retaliation claim.  After Jerry filed a complaint of discrimination against Fluor, his former employer gave him a very bad reference, which limited his ability to find other work.  This is clear from the testimony of David Jones who heard that "Jerry had been banned from the plant because of what Fluor had told BP about Mr. Jerry."  (Ex. G, Declaration of David Jones at para. 14.)  Like the plaintiff in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997), Jerry can prevail in a retaliation claim with evidence that his former employer gave him a negative reference after he made a claim of discrimination.  Jones' revelation, especially when combined with Jerry's success in the field before this Fluor project for BP and the extensive evidence of pretext, is sufficient to support a verdict that, after firing him, Fluor blackballed him because he made a claim of discrimination. (Ex. E, Declaration of B.R. Jerry, at 33.)  Even though a host of people informed Fluor that the decision to fire Jerry was wrong, was not supported by the facts, and was illogical, Fluor ignored them all.  Again, this is an issue for the jury's assessment.

### D. Two Defendants Are Properly Sued

Jerry sued Fluor and Fluor Enterprises because both controlled his employment. Jerry's most recent W-2 from Fluor was issued by Fluor Enterprises, which acknowledges itself as his employer. (Ex. M, BRJ000043, Ex. E, Declaration of B.R. Jerry, at 32.)  That simple fact,

however, is insufficient to establish that Jerry has no claim against Fluor Corporation under the joint employer doctrine.

The Fifth Circuit recognized the joint employer doctrine in *Trevino v. Celanese Corp.,* 701 F.2d 397 (5th Cir. 1983). There, the Court drew upon labor relations theories and rules to articulate how to assess whether separate business entities are sufficiently interrelated to constitute a "single, integrated enterprise" and thus both be liable under the anti-discrimination laws. While the Court set forth four factors that must be considered,[10] it noted that the most important was to assess the centralized control of labor relations – a query that had devolved to, "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Id.* at 404. *See also Vance v. Union Planters Corp.,* 279 F.3d 295, 299 (5th Cir. 2002) (the test for who constitutes the person's employer rests on the determination of who "serves in a supervisory position and exercises significant control over the plaintiff's hiring.")

The evidence in this case supports the joint employer theory. The documents show, for example, that Fluor Corporation's Human Resources Department was involved in the termination. That is precisely what Joe Creel of Fluor Corporation wrote: "I'm not sure what, if anything, we need to do at this point since HR and Terry are already involved." (Ex. B, FEI 0440). He wrote two other employees of Fluor Corporation – Gary Smalley and Robin Chopra – about the so-called investigation and even predicted that Jerry would lose his job. (*Id.*) In addition, one of the reports used in the investigation of Jerry's alleged policy violations was

---

[10]   These four factors are (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control. 701 F.2d at 404.

33

created by Fluor Corporation.  (Ex. B, FEI215.)   If Fluor Corporation and Fluor Enterprises were not closely inter-related, surely Fluor Enterprises would not have access to Fluor Corporation's documents to produce them in this litigation – as they have.

Jerry's professional history with Fluor also shows the Corporation's control over his employment. While Jerry worked for a number of Fluor entities over the course of his tenure, including Fluor Arabia and Fluor Daniel Consultants BV - Kuwait, Fluor Corporation was always involved in his employment. (Ex. B, FEI 57, 63, 79, 82,99.)  Fluor Corporation was the entity that paid Jerry at times, and gave him raises.  (Ex. B, FEI 79).  Further, throughout his jobs with various Fluor entities, Jerry was assigned the same employee number.  (Ex. E, Declaration of B.R. Jerry, at 32). And, the Human Resources Department of Fluor Corporation was involved in each of his assignments. That department transferred Jerry both "intra company" and "inter company," as the form allowed. (Ex. B, FEI 82, 99).

## VI. Rule 56(d) Motion

In one final matter, the plaintiff requests additional time to attempt to secure the Josefina Burr file from either Fluor or the EEOC.  While it was requested in discovery, Fluor insisted that it had no documentation of any other employee raising a complaint about LeBlanc's racial bias. It has today admitted that the charge exists and represents that it has both ordered the file from the EEOC and additionally is seeking the file from Fluor Corporation's former subsidiaryP2S, where it bellieves the charge is located, which is offsite in closed files.

While Jerry possesses a copy of Burr's charge and supporting documents, he needs to obtain other evidence of their authenticity. He thus requests thirty days in which to obtain either

34

the EEOC's verification of authenticity, and of its notice to Fluor of the charge – or, alternatively, to obtain a short deposition of Ms. Burr.

The race discrimination charge by Ms. Burr is relevant to Jerry's case to show LeBlanc's state of mind, and to show Fluor's knowledge that it has reason to question whether LeBlanc's complaint, investigation, and recommendation was free of racial bias. It is thus admissible under FRE 404(b). While the Rules do not allow the introduction of "character evidence" – evidence of other "crimes, wrongs, or acts" – "to show action in conformity, evidence of other bad acts – in discrimination cases as in any other – is admissible for other purposes, such as proof of intent, plan, motive, knowledge, and absence of mistake or accident. *Alaniz v. Zamora-Quezada*, 591 F.3d 761 (5th Cir. 2009). *See also Hitt v. Connell,* 301 F.3d 240, 249-50 (5th Cir. 2002) (holding that evidence of discriminatory firing of third parties was admissible as proof of motive in plaintiff's firing); *Shattuck v. Kinetic Concepts,* 49 F.3d 1106, 1109-110 (5th Cir. 1995) (evidence of discrimination against others in protected class may be highly probative); *Quartino v. Tiffany & Co.,* 71 F.3d 58 (2nd Cir. 1995) (allowing in evidence of treatment by the defendant of other pregnant employees because it was probative to the employer's state of mind).

This request is not for delay, but that so justice can be done.  Fluor does not oppose granting the plaintiff this extra thirty days for the sole purpose of allowing Plaintiff additional time to establish the authenticity of Burr's charge and supporting documents.  Fluor has advised the plaintiff that it opposes any additional depositions, including any deposition of Ms. Burr.

## Conclusion

The plaintiff, B.R. Jerry, thus respectfully asks this Court to deny this motion in all respects.

Respectfully submitted,


s/ Katherine L. Butler *
Federal I.D. No. 4734
State Bar No. 03526300
Paul R. Harris
Federal I.D. No. 897365
State Bar No. 24059905
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
Fax (713) 526-5691

**\*Attorney in charge for Plaintiff**

## Certificate of Service

I certify that a true and correct copy of this document has been served upon the defendants through the Court's electronic case filing system on September 6, 2011.


/s/ Katherine L. Butler

36