Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BALRAM R. JERRY,　　　　　　　*
　　　PLAINTIFF　　　　　　　 *
　　　　　　　　　　　　　　　 * CIVIL ACTION NO. 10-1505
VS.　　　　　　　　　　　　　 *
　　　　　　　　　　　　　　　 * A JURY IS DEMANDED
FLUOR CORPORATION AND　　　　 *
FLUOR ENTERPRISES, INC.,　　 *
　　　DEFENDANTS　　　　　　　*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ORAL DEPOSITION OF
MALCOLM JOHN WERNER
JULY 19, 2011
VOLUME 1 OF 1
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

　　　ORAL DEPOSITION OF MALCOLM JOHN WERNER,
produced as a witness at the instance of the
Plaintiff, and duly sworn, was taken in the
above-styled and numbered cause on the 19th day of
July, 2011, from 6:03 p.m. to 7:49 p.m., before
Linda G. Boyko, CSR in and for the State of Texas,
reported by stenographic means, at the law firm of
Baker Botts, L.L.P., One Shell Plaza, 910 Louisiana
Street, 32nd Floor Conference Room, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record or attached
hereto.

Page 6

1  Q  And so you worked on that project for just two
2  years, till 2008?
3  A  I worked on that project from September -- I was
4  physically at the site from September of 2006 until
5  the end of December 2007.
6  Q  And then did you continue to have supervision over
7  the project, but just from Sugar Land?
8  A  I had some oversight from Sugar Land.
9  Q  But you were also doing other things? You had
10 oversight over other things in Sugar Land as well?
11 A  I had other projects, yes.
12 Q  And while you were on-site at the PS3B Project, I
13 think Mr. Daniel said you were officed in the -- what
14 they called the North Office, is that true?
15 A  Well, it was actually called Malone One, was the
16 office, the north most office of the Malone complex.
17 That was for the majority of the time I was on the
18 site.
19 Q  And is that where B.R. Jerry worked, in Malone
20 One?
21 A  No. He worked in Malone Two.
22 Q  Did you ever have a chance to see Mr. Jerry in
23 action on the site?
24 A  I don't understand what you mean by "in action."
25 Q  Did you observe him working on the job site?

Page 7

1  A  I don't recall seeing him on the job site.
2  Q  Did you ever visit with him in his office on the
3  job site?
4  A  Yes. I did. Actually in a different office,
5  earlier than Malone.
6  Q  Do you know who brought B.R. onto this project?
7  A  No.
8  Q  And so I take it you don't know the particular
9  reason why B.R. was chosen to work on this project?
10 A  No.
11 Q  Do you have a sense of how his performance was on
12 this project?
13 A  I would rate him as average.
14 Q  And why is that?
15 A  He did a reasonably good job. There are things
16 that he did that were done better by others.
17 Q  Like who?
18 A  For example, let me recall his name, Fabian
19 Bernard, Dennis Superville, are two of the names that
20 come to mind.
21 Q  And B.R. did instrumentation and engineering, is
22 that correct?
23 A  Field engineering, specializing in
24 instrumentation.
25 Q  And is that what those two gentlemen did also?

Page 8

1  A  I believe Dennis Superville did. I'm not sure
2  about Fabian. He might have been a mechanical person.
3  Q  Did you talk to Mr. Jerry about ways in which he
4  could improve his performance?
5  A  No.
6  Q  Why not?
7  A  I wasn't Mr. Jerry's direct supervisor.
8  Q  Do you have ideas for what he could have done to
9  do a better job?
10 A  He could have done things without creating as much
11 of a stir as he did.
12 Q  And what was the stir that he created?
13 A  B.R. tended to operate reactively rather than
14 proactively. He waited for problems to develop before
15 he attempted to solve them, rather than anticipating
16 the problems and taking care of them before they
17 became a problem.
18 Q  Do you have some specific examples in mind?
19 A  No.
20 Q  Can't think of a single example?
21 A  I don't recall any at this time.
22 Q  Do you know when B.R. started working on the
23 project?
24 A  Before I did. So I would have said sometime in
25 August, July or August of 2006.

Page 9

1  Q  So what was the status of the project when you
2  came on? Were things going according to plan?
3  A  The project was being mobilized when I came on.
4  Q  And what does that mean?
5  A  That means the resources, the people, the
6  vehicles, the tools, those things were being brought
7  on-site, offices were being sourced.
8  Q  And is it true that by the time you left the site,
9  in 2008, the project had moved into the demobilization
10 phase?
11 A  It had moved into the startup phase for the
12 facility.
13 Q  And what does that mean?
14 A  That means that all the construction people,
15 except for a small group of people, had left the site,
16 and the people who were remaining were to clean up
17 minor items that hadn't been completed and also
18 support BP during the startup of the facility, if it
19 was requested.
20 Q  And so again, you've told me what kind of phase of
21 the project was going on when you started. Just kind
22 of qualitatively, was the project going well when you
23 came on or were there some big problems that you had
24 to clean up?
25 A  It was going well, but as typical, with all

Page 14

1  A  It would depend on the purchase. Generally you're
2  talking Houston local.
3  Q  So when you found out about these laser
4  pointers -- forgive me, how did you know that B.R. had
5  this connection with ISS?
6  A  I didn't know the name was ISS. I was told that
7  the laser pointers came from B.R.'s wife's company.
8  Q  Oh, okay. And who told you that?
9  A  The construction manager.
10 Q  Who was that person?
11 A  Danny King.
12 Q  And did Mr. King think that there was a problem
13 with that?
14 A  No.
15 Q  But Mr. King was not Mr. Jerry's supervisor at the
16 time?
17 A  No.
18 Q  Do you know if the procurement department approved
19 that purchase of the laser pointers?
20 A  That's not quite the way I would -- the way I
21 would answer that question is is that procurement
22 always buys through a proper channel. What was -- in
23 that case, the purchase was small enough that it was
24 placed directly by Jack Mandersheid on his purchasing
25 card, his P-card. So there was no check further up at

Page 15

1  that particular time in the Fluor organization as to
2  whether that purchase was okay or not. Generally, a
3  check on something like that wouldn't happen until
4  weeks later.
5  Q  So I'm trying to figure out what all is
6  inappropriate about the purchase. Was it the fact
7  that it was sole sourced?
8  A  It was sole sourced to a company that was owned by
9  the wife of an employee.
10 Q  Right. But which is the improper part -- or is it
11 both?
12 A  It's both.
13 Q  But I thought you said since it was small, it
14 could be sole sourced.
15 A  Oh, I understand your question now.
16    Yes. It could be sole sourced, but it
17 should not have been sole sourced, when there's a
18 conflict of interest in place.
19 Q  So how did you handle that situation when you
20 learned that?
21 A  I chose to treat it as a mistake by both Mr.
22 Mandersheid and Mr. Jerry. I told Jack Mandersheid
23 that there were to be no more single source purchases
24 to B.R.'s wife's company. That anything could be open
25 bid to them, but no more single source.

Page 16

1     And I called -- I met with B.R. It was
2  the first time I had ever met B.R. And I told him
3  that I believed that what he did was he was trying to
4  do something the right way, but he did the wrong
5  thing. He should have told everybody that it was his
6  wife's company. He should not have expected that
7  order to go to his wife's company. And I basically
8  told him that from that point on, there would be no
9  more single source purchases to his wife's company.
10 Q  And did you put any of that in writing, like in
11 the form of a warning to either Mr. Mandersheid or Mr.
12 Jerry?
13 A  No.
14 Q  Why not?
15 A  I was too busy with other things.
16 Q  Was it in part because you felt like it wasn't
17 severe enough to warrant a formal step of writing it
18 up?
19 A  I don't recall.
20 Q  So you were too busy to put it in writing, but you
21 weren't too busy to figure out all this stuff about it
22 and talk to these guys about it. Is that accurate?
23 A  Well, it was a very serious violation of Code of
24 Conduct, if it was done deliberately.
25 Q  But you didn't think it was done deliberately?

Page 17

1  A  At that time I chose to give him the benefit of
2  the doubt.
3  Q  So is it the case that if you thought it had been
4  done deliberately, then you would have written them
5  up?
6  A  If I thought it had been done deliberately, I
7  would have not only written him up, but he probably
8  would have been terminated at the time.
9  Q  Have you ever, either before or since, had a
10 conflict of interest problem with an employee like
11 that?
12 A  No.
13 Q  Do you think that if you had written it down, it
14 would have been, you know, more clear what was
15 acceptable and what was not acceptable?
16    MS. LeROY: Objection. Calls for
17 speculation. Go ahead and answer.
18 A  What I would say is is that I made it very clear
19 to B.R. the violation that was made. I told him how
20 serious it was. And I did that in person
21 face-to-face. There was no reason for me to believe
22 that he did not understand what I told him.
23 Q  (By Mr. Harris) And what did Mr. Jerry say, if
24 anything, in his own defense?
25 A  He didn't say anything in his defense. He

Page 18

1  apologized for doing that. And he said he wouldn't do
2  it again.
3  Q  Did he tell you that he had previously disclosed
4  in the course of another project this relationship
5  with his wife?
6  A  No.
7  Q  Did you learn of that later?
8  A  Recently.
9  Q  So from that point forward, what you wanted to
10 happen was that ISS could be used, but just not as a
11 sole source vendor?
12 A  That's correct.
13 Q  So that would mean that they would essentially be
14 cut out of making small, of making smaller sales to
15 Fluor, is that right?
16 A  I can't really say. I don't know the, you know,
17 what, if anything, they were cut out of by that.
18 Q  But if it has to be competitively bid, doesn't
19 that mean there has to be a certain dollar threshold
20 or is it the case that a low dollar purchase could be
21 competitively bid as well?
22 A  Yes. It could be competitively bid. And for some
23 purchases, like standard, what's called in the
24 industry soap, rope and dope, which is nuts and bolts
25 and the kind of things that you can buy at Lowe's or

Page 19

1  things like that, it's not uncommon, and we did on
2  that project, is to have a standing contract with a
3  company to provide those types of things, in which
4  case, it wasn't necessary to bid out those things.
5  Q  Does Fluor have some kind of goal in terms of
6  making purchases from minority or female-owned
7  businesses?
8  A  Yes.
9  Q  And can you describe that to me?
10 A  I don't know the details.
11 Q  So that was the first time it came on your radar.
12 But you told me the response to that, which was to
13 have this face-to-face discussion with Mr. Jerry.
14    But that didn't start the investigation
15 that Mr. Kindervater and Mr. Daniel undertook,
16 correct?
17 A  That's correct.
18 Q  So what did start the investigation undertaken by
19 Mr. Kindervater and Mr. Daniel?
20 A  Was some information that became available towards
21 the end of the project in regards to misuse of company
22 vehicle, misuse of expense reports, reimbursement.
23 And some indication that some other procurement
24 procedures weren't being followed correctly.
25 Q  How did this information about potential misuse of

Page 20

1  a vehicle, how did that come to light?
2  A  That was brought to my attention by my office
3  manager.
4  Q  And who is that?
5  A  Amy LeBlanc.
6  Q  And how did this potential problem with the
7  expense reports, how did that come to light?
8  A  I don't recall. I don't recall who exactly
9  brought it up the first time.
10 Q  I mean let me just throw some names out there, see
11 if it jogs your memory. But if it doesn't, that's
12 fine.
13    Was it Chris Henry that brought it to
14 your attention?
15 A  I don't recall.
16 Q  Was it Amy LeBlanc?
17 A  I don't recall.
18 Q  And the information about procurement procedures
19 not being followed, how did that come to your
20 attention?
21 A  That was brought to my attention by one of the
22 procurement expediters.
23 Q  Do you know that person's name?
24 A  Can't think of it offhand. Sorry.
25 Q  Is that a job title, procurement expediter?

Page 21

1  A  Uh-huh.
2  Q  And what does that person do?
3  A  That person makes sure that the materials that are
4  being ordered that are needed immediately, that there
5  isn't any red tape or any other issues in the way,
6  that the procedures have been followed correctly, so
7  that the order will go through smoothly, make sure
8  that the order has actually been placed, verify its
9  delivery time.
10 Q  And what determines whether a particular order
11 warrants expedition?
12 A  The necessity to have the material on the job site
13 to progress the job.
14 Q  And that determination is made by the Fluor people
15 in the field or made by the BP client or --
16 A  Both.
17 Q  So the vehicle, what is the information that Amy
18 LeBlanc -- did she bring it to you directly?
19 A  Yes.
20 Q  Did you know her?
21 A  She's my office manager and my personal assistant.
22 Q  Okay. How long had she served in that capacity
23 for you?
24 A  Over a year.
25 Q  So she kind of did this on her own volition? She

Page 22

1  brought this to you?
2  A  Well, it was part of her job was to look after
3  things in the office that the other managers weren't
4  directly responsible for.
5  Q  Oh, okay.
6  A  Performance of the administrative aids, the use of
7  the vehicle pool, you know, decorum in the office, you
8  know, people are required to wear certain clothes and
9  not others, general office regulations, rather than
10 specific engineering or other tasks.
11 Q  So what did she tell you about B.R.'s vehicle use?
12 A  She told me that she had witnessed and had other
13 people bring to her attention that B.R.'s personal car
14 had remained in the parking lot for an extended period
15 of time. And that he was using a company vehicle to
16 travel to and from his home.
17 Q  Do you know what kind of car B.R.'s personal
18 vehicle was?
19 A  If I recall, it was an older Mercedes, but I might
20 be mistaken.
21 Q  Did that kind of -- I mean if you know, then tell
22 me, and if you don't, that's fine, but do you think
23 that kind of a car would stand out at the job site?
24 A  Any car that sat in a certain spot in the parking
25 lot for an extended period of time would be noticed

Page 23

1  because cars came in and out of there all the time.
2  And we also had a significantly difficult problem with
3  parking. We didn't have enough spaces for the cars
4  that were there. So people actually had parking
5  stickers.
6       So any car that was in the parking lot
7  for a long period of time, somebody would have
8  mentioned it to Amy or Amy may have seen it herself,
9  and she would have written down the tag number and
10 gone back into the office and found out whose vehicle
11 it was.
12 Q  And in your opinion would it be unusual to see a
13 Mercedes at the job site?
14 A  Actually it was an older Mercedes. Construction
15 people spend their money on what they like to spend it
16 on. There's some pretty exotic vehicles in the
17 parking lot from time to time.
18 Q  So I mean it didn't just stick out like a sore
19 thumb just because it was surrounded by, you know,
20 F150's and Silverados then?
21 A  No.
22 Q  Amy said that other people had noticed this, too.
23 Did she mention which other people?
24 A  No.
25 Q  And she said it had been there for an extended

Page 24

1  period of time. How much time are we talking about?
2  A  Several days.
3  Q  And did Amy tell you that she had gone to B.R. and
4  asked him about that?
5  A  No.
6  Q  When was it that she brought this to your
7  attention?
8  A  As I recall, it was sometime in December of 2007.
9  Q  So how did you respond?
10 A  I told her to advise B.R.'s supervisor to talk to
11 him about not using the company vehicle after hours
12 because that was a violation of project and company
13 policy.
14 Q  And that would be a violation, even if he was
15 using it on company business?
16 A  There would be no company business he needed to
17 use it for after hours.
18 Q  How can you be sure of that?
19 A  B.R. worked a normal shift. Anything that had to
20 be done after hours would have been done by the second
21 shift.
22 Q  But you didn't -- I mean you didn't talk to B.R.
23 about this. So you don't know --
24 A  If B.R. had needed to use the vehicle for company
25 business after hours, he would have had to have asked

Page 25

1  permission.
2  Q  Of his supervisor?
3  A  Yes.
4  Q  And would that permission have been freely
5  granted?
6  A  Likely not.
7  Q  Really? That's the opposite of what the other
8  people I have spoken to have said. So why would it
9  not be granted?
10      MS. LeROY: Objection to counsel
11 testifying. Objection, mischaracterizing testimony.
12 Go ahead and answer.
13 A  Because generally things that had to be done after
14 hours, picking up materials, delivering things, we had
15 specific people on the project. And that was their
16 job. We had runners and delivery people and people to
17 pick up things. That was their professional job.
18 Q  (By Mr. Harris) Would it change your evaluation
19 if BP had told Jerry that no, we want you to go check
20 this out off-site for us, make sure we're getting the
21 right product. Does that change your evaluation of
22 the situation?
23 A  No.
24 Q  Why not?
25 A  Because it was against Fluor procedures. It's a

Page 38

1  they would be the ones to do it?
2  A  Yes.
3  Q  Had you ever had them investigate anything else
4  before on that project?
5  A  No.
6  Q  And when was it that you came to them and told
7  them to start this process?
8  A  It was about the time I was leaving the project as
9  I recall.
10  Q  I'm going to show you an e-mail chain that
11  consists of two e-mails. I'll let you read it and
12  then I'll ask you about it. It is labeled FEI 436
13  through 438.
14        And as I mentioned in the other
15  deposition, you see a couple of brackets here. Those
16  are handwritten by us. So you can forget that. But
17  please take a look at that.
18  A  Okay.
19  Q  Do you recognize those e-mails?
20  A  Yes.
21  Q  And the first one is from Amy LeBlanc to Roger
22  Daniel, dated February 13th. Is it your position that
23  the investigation started before that date?
24  A  I said it started formally after I left the site.
25  And this is after I left the site. So this says that

Page 39

1  it probably started sometime in late January or early
2  February.
3  Q  And once you handed off to Mr. Kindervater, as a
4  matter of policy, then I mean it's his investigation
5  to do, right?
6  A  That's correct.
7  Q  And what he is supposed to do is laid out by Fluor
8  procedures, is that correct?
9  A  Yes.
10  Q  Did you expect or request regular updates about
11  the course of the investigation?
12  A  I expected them.
13  Q  Did you receive them?
14  A  Yes.
15  Q  And would that come in the form of e-mails, phone
16  calls or both?
17  A  As I recall, it was phone calls.
18  Q  And would you make any documentation for your own
19  purposes about how the investigation is going or your
20  thoughts about the investigation?
21  A  Well, the team would have made all the notes that
22  were necessary for the investigation. I wouldn't have
23  had any reason to make any additional notes.
24  Q  And you did not make additional notes?
25  A  I don't recall making any.

Page 40

1  Q  Do you know -- again, this first e-mail is from
2  Amy LeBlanc, do you know if she was asked to
3  participate in the investigation or whether she
4  volunteered to help or what? Do you know one way or
5  the other?
6  A  If she was participating, it was because she was
7  asked to participate. We don't allow people to
8  volunteer to participate.
9  Q  Do you know if she had any personal dislike of
10  B.R. Jerry?
11  A  No.
12  Q  No, you don't know?
13  A  As far as I know, she had no personal dislike of
14  B.R. Jerry.
15  Q  Did you ever ask her?
16  A  No.
17  Q  Did she ever have rude things to say about Mr.
18  Jerry in your presence?
19  A  Absolutely not.
20  Q  Did you ask other people around her office or, I
21  don't know, Fred or Roger, did you ask them if they
22  knew of any potential bias that Amy had?
23  A  No.
24  Q  Would it concern you if somebody who was involved
25  in the investigation, like Amy, would it concern you

Page 41

1  if a person like that did have a bias?
2  A  Yes.
3  Q  Why?
4  A  Because it could change the outcome of the
5  investigation.
6  Q  So what do you do, if anything, to figure out if
7  they have a bias?
8  A  Well, the person running the investigation, Fred
9  Kindervater, would have done that.
10  Q  Are you aware that Miss LeBlanc had an EEOC charge
11  of discrimination filed against her?
12  A  No.
13  Q  Nobody brought that to your attention?
14  A  No.
15  Q  Well, now -- I mean knowing that that is the case,
16  does that change your view of her involvement?
17  A  No.
18  Q  Why not?
19  A  Because anybody can bring any EEOC charge against
20  anybody via a hotline or something else. And it has
21  to be investigated. Doesn't necessarily mean it's
22  true.
23  Q  Just like the things that people brought to you
24  about B.R. Jerry. Just because they bring them to you
25  doesn't necessarily mean that they're true, is that

### Page 42

1  accurate?
2  A  No.
3  Q  Really? Why the difference?
4  A  Because there was evidence of Mr. B.R. Jerry's
5  issues.
6  Q  But you don't even know if there was evidence of
7  the discrimination, do you?
8  A  No.
9  Q  Do you have an idea of how long the investigation
10 took?
11 A  As I recall, it was two or three weeks.
12 Q  Did you receive some kind of report about the
13 investigation when it was finished?
14 A  No.
15 Q  Do you feel like it's important for investigations
16 to be documented well?
17 A  Yes.
18 Q  And if someone, like Fred or Roger, is keeping
19 notes, would you agree that it's important to preserve
20 those notes?
21 A  You're talking about notes in regards to the
22 investigation specifically or just notes in general?
23 Q  Yes. Notes about the investigation.
24 A  They would have done everything that they did in
25 written documentation through e-mails or memos.

### Page 43

1  Q  And are you saying that's what they're supposed to
2  do or you know for a fact that's what they did?
3  A  That's what they're supposed to do.
4  Q  So I mean as far as you know, maybe they did,
5  maybe they didn't?
6  A  That would be speculation on my part.
7  Q  And forgive me if you've already answered this,
8  but just so I understand. You agree that it's
9  important for them, if they did keep notes, it's
10 important to keep them?
11       MS. LeROY: Objection, vague. Go ahead
12 and answer.
13 A  If it's required by Fluor's documentation policy,
14 yes, they should have kept them.
15 Q  (By Mr. Harris) But if it's not, then you don't
16 care?
17 A  No.
18 Q  So did Mr. Kindervater come to you at some point
19 and say the investigation is through, this is what
20 we've -- or what I've decided to do?
21 A  He called me and told me that.
22 Q  Do you recall that conversation? Can you give me
23 other details about it?
24 A  What I recall is that he told me that the evidence
25 was well-documented, that the issues that were brought

### Page 44

1  about it, about B.R. were true. And that his
2  recommendation was that B.R. be terminated.
3  Q  Did you check the documentation yourself?
4  A  I have seen some of the documentation. I didn't
5  check every piece of documentation.
6  Q  So did Mr. Kindervater need your approval to
7  terminate Mr. Jerry?
8  A  Needed not only my approval, but the approval of
9  the vice-president of human resources.
10 Q  And who is that person?
11 A  Mr. Joe Zeitouni.
12 Q  Were you there when Mr. Kindervater relayed his
13 recommendation to Mr. Zeitouni?
14 A  No. I was not.
15 Q  Did you and Mr. Zeitouni consult about the --
16 A  We didn't consult. When the decision was made by
17 Mr. Zeitouni that he was satisfied with the
18 investigation, he came and told me verbally that he
19 was satisfied with the investigation and the
20 termination would go forward.
21 Q  And again, you saw not all of the documentation,
22 but enough to make you feel secure in terminating Mr.
23 Jerry?
24 A  Yes.
25 Q  Do you recall what documentation you saw?

### Page 45

1  A  The phone records.
2  Q  What else?
3  A  That was enough.
4  Q  So if that had been the only thing that was
5  alleged against Mr. Jerry, and you saw the
6  documentation you saw, that in and of itself is enough
7  to terminate Mr. Jerry?
8  A  Absolutely.
9  Q  Do you know if Mr. Kindervater felt the same way?
10 A  Yes.
11 Q  He did feel the same way?
12 A  It's an ethics violation. It's defrauding the
13 company. It's stealing from Fluor. That's grounds
14 for termination. It's not only grounds for
15 termination, it's possible grounds for criminal
16 prosecution.
17 Q  Did you consider pressing criminal charges against
18 Mr. Jerry?
19 A  No.
20 Q  Do you know when the decision was made to
21 terminate him?
22 A  Sometime in the latter part of February I believe.
23 Q  And did Mr. Jerry pay the company back for those
24 phone expenses?
25 A  As I recall, he paid some of the money back. And

Page 46

1  then turned around and submitted expense reports again
2  to another person.
3  Q  After he had made the reimbursement?
4  A  Yes. As I recall.
5  Q  And do you know if Mr. Jerry was given the
6  opportunity during the course of the investigation to
7  tell his side of the story on any of these issues?
8  A  It wouldn't have been necessary.
9  Q  So it doesn't matter what Mr. Jerry has to say?
10 A  The evidence was there that he had attempted to
11 defraud the company. There were ethics violations.
12 No matter what he said, the evidence was there that he
13 had done things that he wasn't supposed to do.
14 Q  So it sounds like this was not a gray area for
15 you. This was just easy.
16 A  Ethics violations are easy.
17 Q  Have you ever had to fire someone for an ethics
18 violation before?
19 A  No.
20 Q  Have you ever had to discipline somebody for an
21 ethics violation before?
22 A  If you would consider that first instance, of
23 conflict of interest, I disciplined Mr. Jerry in
24 regards to a conflict of interest in ethics violation.
25 Q  Did you ever discipline Mr. Danny King for a --

Page 47

1  well, we can talk about it. But do you recall
2  disciplining Mr. Danny King?
3  A  Yes.
4  Q  It says it's a written reprimand record. It's
5  Bates stamped FEI 489 and 490. I'll give you a moment
6  to look at this and then we'll talk about it.
7  A  Okay.
8  Q  So the document says that Mr. King was being
9  reprimanded for inappropriate use of corporate Amex
10 card, inappropriate entertainment of clients. Can you
11 tell me more about that situation?
12 A  Danny was using his corporate American Express
13 card in a topless bar in the Texas City area to buy
14 drinks and food for both Fluor employees and BP
15 employees.
16 Q  And is that a violation of Fluor's Code of Ethics?
17 A  It's a borderline thing. Because Danny never once
18 did not pay his American Express bill. He paid his
19 American Express entirely on time. So it wasn't a
20 question of he was using Fluor's money to pay for
21 these, this entertainment.
22        What Fluor's concern was is that their
23 corporate card was being used in the instance of
24 something that wouldn't be seen by the public as
25 right.

Page 48

1  Q  So you're saying that Mr. King was using his
2  corporate card, but he was paying it himself?
3  A  He was paying off all the charges that were
4  against the card.
5  Q  So he wasn't having the company pay for his trip
6  to the strip club. He was paying for it himself?
7  A  That's correct.
8  Q  And I mean what about the fact that he was at this
9  topless bar? That doesn't trouble you enough to make
10 it a more severe punishment than a written reprimand?
11 A  It's after hours. He was on his own time. And he
12 can do what he wants.
13 Q  So because Mr. King waited until after hours to go
14 to the topless bar, it's okay. But you're also saying
15 that if Mr. Jerry was actually doing work after hours,
16 that that's a problem?
17        MS. LeROY: Objection, vague. And
18 mischaracterizes testimony. Go ahead and answer.
19 A  I find your question extremely confusing to me.
20 Because what Danny King was doing was on his own
21 personal time, his own personal business. B.R. Jerry
22 was claiming that he was using a vehicle for company
23 purposes, when he was not authorized to do so. Two
24 entirely distinctly different things.
25 Q  (By Mr. Harris) Do you have any evidence that Mr.

Page 49

1  Jerry was not using the truck for work purposes?
2  A  That's irrelevant. Because he knew that he was
3  not supposed to be using a company truck after hours.
4  Q  Don't you think that Mr. King knew that he
5  shouldn't be taking employees and clients to strip
6  clubs?
7  A  He was using his money to do that.
8  Q  But he was using the corporate credit card?
9  A  But he was repaying all the money.
10 Q  Did you ever consider giving him a more severe
11 disciplinary action than this?
12 A  No.
13 Q  And how did this come to your attention?
14 A  It was brought to my attention by Fluor internal
15 auditing.
16 Q  And are those internal audits like a regularly
17 scheduled thing?
18 A  Generally they happen at certain frequencies on a
19 project.
20 Q  Do you know what those frequencies are?
21 A  We only had one during basically the two-year span
22 on the project.
23 Q  So somebody from the auditing department uncovered
24 this and then brought it to you?
25 A  In the course of looking at expense reports and

Page 70

CHANGES AND SIGNATURE

Page  Line  Change      Reason

1  _____
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 71

1  I, MALCOLM JOHN WERNER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MALCOLM JOHN WERNER

THE STATE OF _____:
COUNTY OF _____:

Before me, _____, on this day personally appeared MALCOLM JOHN WERNER, known to me (or proved to me under oath or through Subpoena Duces Tecum) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ____ day of _____, 2011.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

Page 72

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BALRAM R. JERRY,          *
     PLAINTIFF            *
                          * CIVIL ACTION NO. 10-1505
VS.                       *
                          * A JURY IS DEMANDED
FLUOR CORPORATION AND     *
FLUOR ENTERPRISES, INC.,  *
     DEFENDANTS           *

I, Linda G. Boyko, a Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the facts as stated by me in the caption hereto are true; that the above and foregoing answers of the witness, MALCOLM JOHN WERNER, to the interrogatories as indicated were made before me by the said witness after being first duly sworn to testify the truth, the whole truth and nothing but the truth, and same were reduced to typewriting under my direction; that the above and foregoing deposition as set forth in typewriting is a full, true and correct transcript of the proceedings had at the time of taking said deposition.

I further certify that I am not, in any capacity, a regular employee of the party in whose

Page 73

behalf this deposition is taken, nor in the regular employ of their attorney; and I certify that I am not interested in the cause, nor of kin or counsel to either of the parties.

Given under my hand and seal of office on this, the _____ day of _____, 2011.

_____
LINDA G. BOYKO, Texas CSR
Firm No. 469
License No. 712, Exp. 12-31-2012
607 Rustic Lane
Friendswood, Texas 77546